**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Shaleda Busbee, Administrator of the Estate of Tyrone Briggs | : : : | |
| | : | **Case No.** |
| **Plaintiff,** | : : | |
| **v.** | : : | |
| | : : | |
| **Pennsylvania Department of Corrections;** | : | **JURY TRIAL DEMANDED** |
| **Superintendent Theresa DelBalso; Deputy** | : | |
| **Superintendent Charles Stetler; John Does #1–11** | : : | **ELECTRONICALLY FILED** |
| **Defendants.** | : : : | |

**COMPLAINT**

**JURISDICTION**

1. Plaintiff brings this civil action for monetary relief pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"); Pennsylvania state law prohibiting medical neglect; and also pursuant to 42 Pa. C.S.A. §§ 8301 (wrongful death) and 8302 (survival action).

2. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4). Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to hear and adjudicate state law claims.

3. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Middle District of Pennsylvania.

**PARTIES**

4. Shaleda Busbee is the administrator of the Estate of Tyrone Briggs, who was killed at State Correctional Institution (SCI) Mahanoy after being subjected to excessive force by correctional officers who deployed an extraordinary and unjustifiable amount of pepper spray that triggered an asthma attack, and then denied Briggs proper medical care resulting in his death. She brings this action on behalf of the Estate of Tyrone Briggs and on behalf of all beneficiaries of the Estate.

5. Defendant the Pennsylvania Department of Corrections (DOC) is an agency of the state of Pennsylvania that operates SCI Mahanoy and receives federal funding.

6. Defendant Theresa DelBalso was the Superintendent at SCI Mahanoy at the time of the events giving rise to this action. She is sued in her individual capacity.

7. Defendant Charles Stetler was the Deputy Superintendent at SCI Mahanoy at the time of the events giving rise to this action. He is sued in his individual capacity.

8. Defendant John Doe numbers 1-11 are correctional officers and/or medical personal who were employed at SCI Mahanoy in November 2019. Plaintiff does not know the names of the John Doe defendants but will amend the Complaint to include proper names after the completion of initial discovery. At all times relevant to this Complaint, Defendants John Doe number 1 through number 11 were acting as agents of the Pennsylvania Department of Corrections and were acting within the course and scope of their employment. They are sued in their individual capacities.

9. At all times, all defendants were acting under color of state law.

10. At all times, all defendants were acting in concert and conspiracy and are jointly and severally liable for the harms caused to the Estate of Tyrone Briggs.

2

**STATEMENT OF FACTS**

11. Tyrone Briggs was incarcerated at age 15. His minimum sentence was 15 years, after which time he was to become eligible for parole.

12. However, a short time before becoming parole eligible and gaining the opportunity to return to his family and community for the first time as an adult, Tyrone Briggs died at age 29 while incarcerated at SCI Mahanoy. He was killed through a lethal combination of excessive force, callous and inhumane disregard of a medical emergency, and policies and practices that permitted reckless staff violence and failed to make reasonable accommodations for disabled individuals with asthma. But for the acts, omissions, policies and practices of defendants, Tyrone Briggs would be alive today.

13. Tyrone Briggs suffered from asthma since he was a very young child, before he went to grade school. DOC employees knew he had asthma, as it was documented in his medical records dating back many years, and Mr. Briggs was regularly issued inhalers by medical staff.

14. On November 11, 2019, Tyrone Briggs went to afternoon outdoor recreation and played basketball.

15. At the close of recreation time, as people were returning to the inside of the prison, Mr. Briggs was attacked by another incarcerated person.

16. Mr. Briggs attempted to defend himself.

17. Numerous correctional officers approached the scene. They were given an order by a radio broadcast from another correctional officer not to physically intervene to break

up the altercation, but to instead use oleoresin capsicum (OC) spray, colloquially known as pepper spray.

18. OC spray is an inflammatory agent that affects the mucous membranes in the eyes, nose, throat, and lungs. It results in serious consequences, including a painful burning sensation of the lungs and associated shortness of breath, and temporary blindness.

19. OC spray can have serious, long-lasting effects, including the risk of death, on people with underlying respiratory illnesses and conditions, including people diagnosed with asthma.

20. OC spray poses a particularly high risk of serious injury or death when deployed on people with respiratory conditions, such as asthma, when they are subjected to significant volume or prolonged exposure to the chemical agent.

21. Correctional Officer defendants John Does all have been trained in the use of OC spray. Consistent with the training, they were aware that when using OC spray, they were permitted to only use one or two quick bursts. They were, likewise, aware that any different usage—including prolonged spraying—was not permitted as such usage poses a substantial danger to the person subject to the spray.

22. DOC correctional officers, including John Doe defendants, are not trained in regard to the heightened risk that asthmatics face when subjected to a serious respiratory irritant like OC spray.

23. Contrary to policy and training, defendant John Doe number 1 unloaded nearly an entire can of OC spray upon Mr. Briggs and the other person involved in the altercation.

24. Rather than moving to break up the altercation, numerous correctional officers, including John Doe defendants, refrained from intervening at this point.

25. Instead, defendant John Doe number 2 unleashed more OC spray, and, like defendant John Doe 1, pressed the trigger for a prolonged period, dousing Mr. Briggs with OC spray.

26. Mr. Briggs was trying to get out of the way of the OC spray during this time, but was unable to escape due to the volume and prolonged nature of the spray that was aimed toward him.

27. After this second can of OC spray was deployed, approximately 5 to 6 defendants rushed Mr. Briggs and slammed him to the ground. Defendant John Doe number 3 gratuitously unloaded yet another can of OC spray directly at Mr. Briggs' face while he was restrained on the ground.

28. Mr. Briggs was then handcuffed.

29. Mr. Briggs immediately began showing signs of respiratory distress. His breathing was extremely labored.

30. Multiple people overheard him repeatedly say, "I can't breathe."

31. Mr. Briggs continued to say he could not breathe as the defendant officers were surrounding him to escort him from the yard.

32. Mr. Briggs was left in the yard for an extended period without any medical attention and was unable to move because he was seriously injured and unable to breathe properly.

33. Mr. Briggs was eventually forced to walk across the yard and through the institution several hundred yards to the infirmary.

34. Mr. Briggs' breathing was so labored that he had a hard time walking or exerting himself. He fell before he was able to re-enter the prison, and he remained sitting in the grass for a prolonged period, struggling to breathe.

35. Based on Mr. Briggs' complaints about his difficulty breathing immediately after the deployment of an excessive amount of OC spray, the defendant officers were aware that Mr. Briggs had serious medical needs requiring emergency treatment.

36. Despite this obvious medical emergency, defendant correctional officer John Does failed to summon any assistance for Mr. Briggs in obtaining immediate medical care. Defendant correctional officer John Does exhibited no concern and offered no meaningful assistance to Mr. Briggs, despite his obvious state of medical distress and repeated assertions that he could not breathe.

37. At no point did defendant correctional officer John Does radio medical staff to ascertain if Mr. Briggs suffered from a respiratory condition, such as asthma, or have any other disability that was cause for medical concern and emergency treatment due to his having been saturated with OC spray.

38. When at the infirmary, neither correctional officer defendant John Does or the medical defendant John Does prioritized his treatment. Instead, he was forced to wait while the other individual was seen.

39. When finally seen by medical staff approximately 30-45 minutes after he was first exposed to massive amounts of OC spray, Mr. Briggs was not provided necessary treatment.

40. Instead, medical defendants provided Mr. Briggs an inhaler, which, as medical defendants knew based on their observations, was clearly insufficient at restoring

6

normal breathing. Despite Mr. Briggs' continued symptoms even after using an inhaler, medical defendant John Does did not provide any further treatment to alleviate Mr. Briggs' obvious medical distress.

41. Despite the obvious risks presented by an uncontrolled asthma attack, risks that were known to medical defendant John Does on account of their medical training and their awareness of Mr. Briggs' asthma condition, as indicated by their provision of an inhaler to Mr. Briggs, they failed to provide necessary breathing treatments or emergency care.

42. Shockingly, and in total disregard for his life, medical defendants authorized Mr. Briggs' removal from the infirmary while they knew he was in visible, deadly medical distress, unable to breathe properly, in the throes of a prolonged asthma attack, with his lungs virtually swimming in OC spray, and his body and clothing stained orange from the OC spray.

43. Mr. Briggs was escorted by some of the defendants to the Restricted Housing Unit where he was placed in solitary confinement. Even though Mr. Briggs' inability to breathe was still apparent, defendants ignored his medical distress, in wanton disregard of his life.

44. After the officers placed Mr. Briggs in a cell, he collapsed and lay on the floor. Defendants left him there for several minutes at least. He became non-responsive, as he had been slowly asphyxiating without necessary medical intervention for over an hour at this point.

45. Staff eventually observed that Mr. Briggs was not responsive and brought him back to the infirmary, but he had stopped breathing. He had died.

*Failure to Accommodate People with Respiratory Disabilities in Use of Force Training and Policy*

46. The DOC does not adequately train its officers in the risks presented by OC spray to individuals with asthma or other respiratory disabilities.

47. Staff are not instructed that OC spray can cause breathing difficulty that requires emergency medical attention and can even pose a risk of death.

48. Supervisory officials at SCI Mahanoy, including Superintendent DelBalso and Deputy Superintendent for Facility Management Stetler, have failed to train, reprimand, and discipline officers who use OC spray in violation of the training instruction that they utilize short, quick bursts.

49. Use of OC spray had increased in the years preceding the use of OC spray that led to Mr. Briggs' death. Often, staff would press the trigger of the OC spray for prolonged bursts, fire multiple times, and saturate a person and/or area with spray in violation of training. Staff did not receive any correction, training, or discipline for using OC spray in such dangerous ways.

50. Consequently, neither correctional officers nor medical staff have been trained on the necessity of determining at the earliest possible time whether an individual subject to the use of OC spray has a respiratory disability, such as asthma, that necessitates immediate medical attention.

51. The need for such an early alert is obvious since a respiratory irritant like OC spray poses a greater risk to people with respiratory disabilities.

52. Despite this obvious need, Defendants DOC, Superintendent DelBalso, and Deputy Superintendent for Facility Management Stetler, did not create an early alert system, even though such a practice is feasible and necessary.

53. DOC policy already requires the Correctional Health Care Administrator to maintain a centralized list of all incarcerated people at the prison with a disability of any kind.

54. Although the DOC recognizes the risks of OC spray upon people with asthma, precluding planned use of force against individuals such as Tyrone Brigg, it failed to provide reasonable accommodations to mitigate and eliminate the heightened risk presented to people with respiratory disabilities.

55. Mr. Briggs required reasonable modifications to policies and procedures necessary to ensure accommodations for his asthma, including but not limited to access to rapid medical attention and necessary medical devices.

56. The DOC failed to provide any reasonable accommodation by not making available easy access to necessary medical devices. Prompt identification by properly trained correctional staff would have allowed for immediate provision of an inhaler and/or further breathing treatments as medically indicated.

57. The DOC failed to make a necessary reasonable accommodation by not preventing uses of force that present obvious and serious risks to individuals with respiratory disabilities. As a result of that failure, supervisory staff decided immediately to forego all other avenues of intervention, including de-escalation or attempting to physically subdue Mr. Briggs and the other individual involved in the incident, instead resorting to the immediate and unrestricted use of OC spray.

58. The DOC failed to make a necessary reasonable accommodation in its failure to institute a policy for identifying those with respiratory disabilities to avoid fatal or highly injurious spontaneous use of OC spray. It is a standard practice in other institutional settings to ensure prompt identification of individuals with respiratory conditions through immediate contact to the medical department, or through another means such as indication on an incarcerated person's identification card.

59. The DOC failed to make a necessary reasonable accommodation in its failure to train officers generally on identifying respiratory distress and how to respond to such distress. Defendants' failed to provide training to correctional officers as to how to provide disability-related accommodations in recognizing and responding to respiratory distress in individuals with respiratory disabilities. The lack of training resulted in officers ignoring and minimizing Mr. Briggs' respiratory distress, not recognizing the severity of the situation and the need for emergency medical intervention. Instead, they proceeded as if this was business as usual, and a superficial trip to medical was followed up by placing Mr. Briggs in solitary confinement in the RHU and forgetting about him.

60. Through its failures to make reasonable accommodations in its use of force training, policies, and practices in regard to OC spray, the DOC allowed its officers to use force in a manner that ignored the particular risks faced by individuals who, like Tyrone Briggs, were living with respiratory disabilities.

61. The DOC's failures to make reasonable accommodations in its use of force and use of OC spray policies directly resulted in the death of Tyrone Briggs.

**CAUSES OF ACTION**

**Count I – Violation of Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* – Against Pennsylvania Department of Corrections**

62.     Title II of the ADA states, in pertinent part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity." 42 U.S.C. § 12132.

63.     Mr. Briggs was a qualified individual with a disability. Under the ADA, "'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(2). Qualified individual with a disability is defined as an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131 (2).

64.     A "public entity" is defined as "any State," the state's agencies and their instrumentalities. 42 U.S.C. § 12131(1).

65.     A public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7).

66.     As a result of Defendants' failure to make reasonable modifications to policies and procedures, Mr. Briggs was denied necessary reasonable accommodations.

67. Defendants discriminated against Mr. Briggs by failing to train officers to recognize his respiratory disabilities and provide a medical response that recognized the

heightened risk of serious injury or death that he faced as a result of those respiratory disabilities.

68. Defendants' acts and omissions resulted in disability discrimination in violation of the Title II of the Americans with Disabilities Act ("ADA").

**Count II – Eighth Amendment Medical Care Claim – Against Defendant John Does 1-11**

69. Defendant correctional officer John Does were deliberately indifferent to Mr. Briggs' need for medical care when they refused to provide him with immediate care, not calling in a medical emergency despite his inability to breathe, and delaying his trip to the infirmary while he was visibly asphyxiating on OC spray.

70. Defendant medical staff John Does were deliberately indifferent to Mr. Briggs' need for medical care when they refused to provide him with emergency care for his asthma attack, clearing him for placement in the RHU even though he was in obvious, visible medical distress.

71. Defendant correctional officer John Does were deliberately indifferent to Mr. Briggs' need for medical care when they placed him in an RHU cell, left him alone to die, and did not respond even after Mr. Briggs collapsed on the floor of his cell, even though Mr. Briggs was in obvious medical distress and in need of immediate, emergency medical care.

72. These failures to provide Mr. Briggs with adequate medical care violated his Eighth Amendment right under the U.S. Constitution.

**Count III – Eighth Amendment Excessive Force Claim – Against Defendant John Does 1-9**

73.   Defendant correction officer John Does maliciously engaged in excessive force against Mr. Briggs that was in gross excess of any security need. The amount of OC spray was far greater than training permitted, far greater than was needed to control the altercation, and used with an intent to cause harm to Mr. Briggs.

74.   The excessive use of force against Mr. Briggs violated his Eighth Amendment right under the U.S. Constitution.

**Count IV – Eighth Amendment Supervisory Liability Claim – Against Defendants DelBalso and Stetler**

75.   Defendants DelBalso and Stetler were responsible for authorizing, condoning, implementing, and acquiescing in policies and practices that were deliberately indifferent to excessive use of force by correctional officers at SCI Mahanoy. These policies and practices include failing to regularly train staff on de-escalation tactics; failing to train staff on the serious health risks of OC spray; failing to train staff on the need to obtain immediate medical attention after use of OC spray; failing to discipline staff who used OC spray in a manner contrary to training and policy.

76.   The policies and practices of defendants' DelBalso and Stetler resulted in violation of Mr. Briggs' Eighth Amendment rights.

**Count V – Medical Malpractice – Against Medical John Doe Defendants**

77.   Defendant medical staff John Does committed medical malpractice when they failed to provide proper emergency care to Mr. Briggs while he was suffering a severe asthma attack that prevented him from breathing, eventually resulting in his death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.  Award compensatory damages;

B.  Award punitive damages against defendants DelBalso, Stetler, and all John Does;

C.  Grant attorneys' fees and costs;

D.  Such other relief as the Court deems just and proper.


*/s/ Bret D. Grote*
Bret D. Grote
PA I.D. No. 317273
Quinn Cozzens*
PA I.D. No. 323353
Jamelia N. Morgan – *of counsel*\*
NY I.D. 5351176
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221
Telephone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

*/s/ Jonathan H. Feinberg*
Jonathan H. Feinberg
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Office: 215-925-4400
Fax: 215-925-5365


*Counsel for Plaintiff*

*\*Pro Hac Vice Admissions Application Forthcoming*


DATED: December 22, 2020